SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND JUDICIAL DEPARTMENT
------------------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                                    Respondent,

                                                                    A.D. No.

                        -against-

VICTORIOUS KINGSBERRY,
                                    Defendant-Appellant.

Kings County Indictment No. 3289/14
------------------------------------------------------------------------------X

## APPELLANT'S BRIEF

### Preliminary Statement

Defendant-Appellant Victorious Kingsberry appeals as of right from a judgment of the Supreme Court, Kings County (Firetog, J.), entered on March 7, 2016, convicting him of the crimes of murder in the second degree (Penal Law §125.25) and criminal possession of a weapon in the second degree (Penal Law §265.03), and imposing sentence.

A timely notice of appeal was filed. Defendant-Appellant is currently incarcerated under the terms of the sentence.

## QUESTIONS PRESENTED

1. Whether the evidence was legally and factually sufficient to establish Defendant's guilt of murder in the second degree(intentional)?

The court denied defense motions regarding the sufficiency of the evidence at the close of the People's case and the close of the evidence.

2. Whether Defendant deprived of a fair trial by the court's failure to instruct the jury on accomplice corroboration?

The court failed to give the charge.

3. Whether defense counsel's failure to make essential motions and objections constituted ineffective assistance of counsel.

4. Whether Defendant was deprived of his right to a fair trial by the prosecutor's arguments relying on matters not in evidence, and vouching for the People's witnesses.

The court overruled counsel's objections to many of the improper arguments.

5. Whether the People authenticated the Facebook communications sufficiently for the materials to be admitted into evidence.

Defense counsel did not object to the evidence on authentication grounds.

6. Whether Defendant's sentence near the statutory maximum was excessive.

2

## STATEMENT OF FACTS

The Indictment

By Kings County Indictment Number 3289/14, Defendant was accused of committing the crimes of murder in the second degree, and criminal possession of a weapon in the second degree (two counts), it being alleged that Defendant, in the County of Kings, on or about March 15, 2014, with the intent to cause the death of Gilbert Kelly, did so by shooting him with a firearm.

The Pretrial Hearing

Defendant had no prior criminal convictions. For that reason, the People agreed that no criminal history questions would be asked for impeachment purposes (T. 17-8).[1]

On the first day of trial, defense counsel moved to exclude undated photographs of Defendant that appeared to depict him holding a firearm similar to the weapon responsible for the victim's death (T. 2-5). The court denied the motion, describing the images that had been posted on Facebook as "very powerful evidence" (T. 4-5). Defense counsel informed the court that photos of others in this

---

[1] Numerical references preceded by "T." refer to the trial minutes and by "S." refer to the sentencing. When applicable, the identity of the testifying witness or document precedes each such reference.

case - holding the same firearm - had also been posted on Facebook. The court stated that it would review the images and reconsider the motion, offering to sign a subpoena.

Defense counsel responded, "How am I going to get the Facebook stuff within the next day or two? It's not going to happen," and asserted that the prosecutor should supply the materials (H. 6). The prosecutor denied having the photos and counsel exhorted the judge, "Make the People have access to the Facebook accounts" (H. 7). The court declined to do so, making clear it would not delay the trial (*id.*).

## The Trial

## The People's Case

### Background

During the early morning of March 15, 2014, Gilbert Kelly, was killed by a single bullet on Grand Avenue, the Brooklyn street where he spent most of his time, often collecting bottles in a shopping cart (Kelly T. 49-51; McCubbin T. 60, 62; Miranda T. 77; Stenck T.98).

Law enforcement authorities quickly determined that Mr. Kelly had been shot by one of six men (Layne T. 392-4, 426; Burnett T.179-182, 202, 270). A number of street cameras had captured images of the men throughout the night of the shooting, and authorities recovered those recordings before questioning the

4

witnesses/suspects (Parker T. 501, 505-512; Burnett T. 134, 201, 233-; Parker T. 506-7, 509-14). None of the images captured the moment that one of the men pointed a firearm and pulled the trigger (T. 37). Two of the six men testified at trial against Defendant. Before doing so, each had the opportunity to watch the images of their own actions that went into evidence of their movements that night (Burnett T. 198-209, 233-40, 260, 265-7).

Two weeks after the slaying, police recovered a revolver from Kayla Banks during her arrest with Malik Birt, neither of whom were witnesses in this case (Dumelle T. 451, 457, 458, 459-66). Police ballistics experts and a pathologist determined that Mr. Kelly had died from wounds caused by a bullet fired from that firearm, a .380 semi-automatic Hi-Point revolver, a common gun with a distinctive shape and silver strip on the side (the 'Gun') (Miranda T. 83-4; Steneck T. 98, 104-7, 110; Acevedo T. 313-21; Liguori T. 329-340, 347; Parker T.509).

## The Prior Relationships of the Six Men

By the time he testified in this case, Tyquan Burnett ("Burnett") was incarcerated for a violent robbery spree and his organizing role in a shoot-out that left 2 bystanders seriously injured (Burnett T. 129, 220-232, 241). A year and a half earlier, during March 2014, Burnett was 16 years old, a ninth grader with sporadic school attendance and little adult supervision (Burnett T. 127, 123, 216). After his mother died in 2011, Burnett began living with Leetha Burnett, his aunt

5

and legal guardian, together with her two children. By early 2014, Leetha's boyfriend, Donte Kennedy, was staying every night with her at the apartment (the "Burnett/Kennedy Apartment"), located at 345 Classon Avenue in the Bedford Stuyvesant neighborhood (*id.* at 123-6, 137, 244; Layne 411, 414).

Burnett estimated that Donte Kennedy was at least 5 years older than him. The sixteen year old felt close to his guardian's boyfriend (Burnett T. 244-5). He literally looked up to Kennedy, who was about 6 foot 3 inches (Burnett T. 125, 137-8, 202, 243-4). It would appear that Kennedy was not a good role model. Two photographs depicted Donte Kennedy holding a revolver, including one picture taken in the Burnett/Kennedy apartment (*id.* at 272-3, 287). The jury would never see words written on the photos, referring to "… shooting people in the head" (T. 281-2).

Aunt Leetha allowed the Burnett/Kennedy Apartment to be used as a gathering place for her nephew's friends. One particularly close buddy of 10 years was Matthew Layne, who lived a few floors away in the same building. Isac Danilo and Elijah Mack, also his friends of many years, spent lots of time at the Burnett/Kennedy Apartment (*id.* at 141-23; Layne T. 378-9, 411, 413). In Burnett's eyes, Kennedy was "something like" a leader of the teenagers, who usually did what the older man suggested (Burnett T. 245-6).

6

Defendant started spending time at the Burnett/Kennedy Apartment in January 2014, when he was 17 years old (Burnett T. 130-1, 135, 137; Layne 412-14). After reconnecting with Defendant, Burnett started communicating with him on Facebook. On the social media platform and elsewhere, Burnett went by the name "Ty da Gunna." The reference to guns and violence was typical of the group. Defendant went by the name "Shottie Bugati" and Danilo chose to be called "Bloody" (*id.* at 139-142, 242; Layne T. 383, 411).

Layne, the other accomplice witness at trial, never got to know Defendant well enough to learn his true name (Layne T. 379-80). Layne felt closer to Burnett and Kennedy than he did to Defendant (*id.* at 410-3).

## Donte Kennedy and the Teenagers' Actions Before the Shooting

On the afternoon preceding the shooting, the Gun was on the bureau of Burnett's bedroom. Burnett acknowledged that the Gun was present in his home on a daily basis (Burnett T. 164, 167, 216). Asked how it came to pass that the Gun was there "almost every day", Burnett answered, "I don't remember" (Burnett T. 164). Burnett said he also saw Defendant with the Gun on a nearby street "every day" (*id.* at 168-9).

On March 14, 2014, Burnett spent the day at home with Donte Kennedy and his younger friends Mack, Danilo, Layne and Defendant. Some of them had slept over the prior night and skipped school that day. Aunt Leetha allowed them to

7

spend the day hanging out and smoking marijuana there (Burnett T. 144-6, 180, 246-9; Layne T. 382). In the late afternoon, Defendant left the apartment, arranging to meet the group later at the subway. The Gun remained on Burnett's dresser when Defendant left (Burnett T. 145-7, 149-152, 249-50).

At least that was Burnett's testimony. Layne testified that he had not stayed overnight or spent Friday with the others. He asserted that he only arrived at the Burnett/Kennedy Apartment around 7 or 8 p.m., to find Donte Kennedy, Burnett, Danilo, Mack, and Defendant already there (Layne T. 414-5). Layne testified that all 6 of them took a taxi to the subway entrance. He was emphatic that he did not carry the Gun or see any of the five others doing so on their way to a party they all planned to attend at "Pudgy's" home (*id*. at 384-5, 416-7).

Burnett had a different story, which did not include a taxi. He said that the group took turns carrying the Gun. Donte Kennedy was the one who carried the firearm out of their apartment. As the older man, and the teenagers, walked to the subway, Donte Kennedy gave the gun to Elijah Mack (Burnett T. 250-1). Mack continued to carry the Gun until the group got to Pudgy's party *(id.* at 251-2). At least that was one of Burnett's versions. He also testified that he did not know if any of his companions had been carrying a firearm when they set out for the party (Burnett T. 152). And, in yet another scenario, Burnett testified that Kayla Banks

8

met the group at the subway stop after the hour long subway trip to the party, and Defendant gave her "the gun" (Burnett T. 154,252).

## The Police Frisk and the Gun Play at the Party

Burnett testified that he and the five others, including Defendant, were all body-searched by police as they waited outside a restaurant near the party. The Gun was not retrieved, in Burnett's telling, because Kayla Banks was inside the restaurant with the Gun in her purse (*id.* at 155-6). Layne recalled, quite differently, that Kayla Banks did not join the group on the way to the party. It was Layne's testimony that he was not frisked by police because he was inside the restaurant. In Layne's version, Defendant and the four others were searched by police outside, but he avoided any police inquiry (Layne T. 386-9). The prosecutor did not call to the witness stand Ms. Banks or any of the officers involved.

Donte Kennedy and the teenagers arrived at the party around 9 or 10 o'clock (Burnett T. 156-7, 252). At Pudgy's, about 20 guests were drinking alcohol and smoking marijuana "a lot" (*id.* at 157-61, 252; Layne T. 419-20). Layne testified that Mack allowed other party goers to handle the Gun, and Defendant spoke on a cell phone about an "eighty," which Layne understood as a reference to the Gun (Layne T. 390, 423-4). Burnett testified that it was Kayla, not Mack, who allowed

9

"everybody" to take turns "playing with the gun" (Burnett T.166, 169, 253-4; Layne T. 389-90).

Around 2 or 3 o'clock a.m., Donte Kennedy and the teenagers departed (Burnett T. 175-6, 255; Layne 390). According to Burnett, Kayla carried the Gun and gave it to Defendant at the subway entrance before leaving the group. Burnett testified that, on the train, Defendant gave it to Mack, who carried it for the rest of the night (Burnett T. 177-8, 256-7).

Once again, Layne's memory was different. He testified that Kayla did go to the subway entrance with the group. Layne saw Mack carrying the Gun from the party and during the entire train ride (Layne T. 391-2, 424-5, 441-2). During a transfer, Donte Kennedy and the five teenagers came upon a "group of people and they wanted to fight or whatever" (Burnett T. 179). Somehow, the "fight or whatever" was averted (*id.* at 270-1). After exiting the subway, the six looked for "some boys" with the aim of confronting "Marcel." Eventually, they gave up and started walking towards the Burnett/Kennedy Apartment (Layne T. 392-4, 426; Burnett T.179-182, 202, 270).

The Encounter with Mr. Kelly

Burnett and Layne testified that, as the group walked home, Mack continued to carry the Gun. The returning party-goers stole grapes and strawberries from an outside grocery display (Burnett T. 182-4, 186, 257-8; Layne T. 395-6, 426, 431).

10

They were rowdy, yelling and throwing fruit at other people on the sidewalk. The group turned onto Grand Avenue, a street lined on both sides with parked cars. They saw a man approaching them on the same sidewalk; it was Mr. Kelly. Donte Kennedy, and the five teens, pelted him with the fruit from about 20 feet away. The "real old man", in Burnett's opinion, "looked like a bum" (Burnett T. 185-7, 257-61; Layne T. 395-7, 427, 431). Burnett admitted that he stood in the front as all six threw fruit at Kelly. Layne denied participating (Burnett T. 261; Layne T. 397, 428).

Mr. Kelly yelled at the group, over and over, "Get off my Block". Then, he pulled out a knife (Burnett T. 187, 260-2; Layne T. 395, 397, 429; Miranda T. 90; Steneck T. 98, 103-4). After Kelly threatened them with the weapon, the six ran across Grand Avenue and hid behind cars parked on the opposite side of the street (Burnett T. 187-8). Kelly did not follow (Burnett T. 188-9). Burnett crouched behind one car with Kennedy, Mack, Danilo, and Layne. Defendant was hiding several car lengths away (Burnett T. 189-190, 197, 264-5; Layne T. 431).

Burnett testified that Defendant asked Mack to give him the Gun, referring to it as "my gun." Mack gave him the firearm, and there was no testimony that any of the five others tried to discourage Mack from doing so. Then, according to Burnett and Layne, Defendant fired in Kelly's direction (Burnett T. 190-1, 285). Layne was running away from Kelly when he heard the shot. He testified initially

11

that "they pulled the trigger". Then, he changed the words, saying that Defendant was the shooter (Layne T. 399-400, 433).

Burnett, Danilo and Layne fled down Grand Avenue with Donte Kennedy trailing a bit behind the teenagers. Defendant and Mack had peeled off from the group, and disappeared from that street (Burnett T. 192-3, 265; Layne T. 401-2, 434). When the group of four reached a deli near the Burnett/Kennedy Apartment, they stopped for a while and Kennedy bought cigarettes (Burnett T. 193-4, 134, 214; Layne T. 402-3). Then, Layne went to his apartment. Burnett and the others went to the Burnett/Kennedy Apartment, where Mack and Defendant joined them for the night (Burnett. T. 214-5; Layne T. 404, 435). The Gun returned to its place on Burnett's bedroom dresser, once again (Burnett T. 216).

The Men's Actions After the Shooting

When Burnett woke later that morning, Defendant was gone. But the Gun remained in Burnett's bedroom, on his bureau. Indeed, the murder weapon remained there until Burnett was arrested ten days later for the Kelly homicide (*id*. at 216-7, 268-9). On the morning after the shooting, Burnett had plenty of time to speak with Donte Kennedy, and Layne about the shooting (*id.* at 278). The three of them hung out together that day, and the following week, without Defendant being present (Layne T. 405). As was typical of his effort to hide any accessorial role,

12

Layne testified that he never talked with Burnett or Kennedy about the shooting during all of those conversations (*id.* at 436, 440, 443, 446).

Then, on March 26, 2014, when Burnett was arrested and questioned by authorities, Donte Kennedy removed the Gun from the Apartment (Burnett T. 217, 278; Parker T. 516). On cross, Burnett changed his testimony, claiming Defendant had moved the Gun out of the Apartment in response to his arrest (*id.* at 268-9). At trial, the court barred defense counsel from questioning the officer, who had arrested Kayla Banks, about her statement to authorities that she had not received the Gun from Defendant (Dumelle T. 474).

Following Layne's arrest on unrelated assault charges in April, 2014, detectives questioned him about the Kelly homicide (*id.* at 405-7). In June and July 2014, Matthew Layne pled guilty to reduced charges in two separate cases. One involved an incident when family members called police "on me", as he put it (Layne T. 407). Layne minimized his culpability, characterizing the offense as "cops [saying] that I hit them" (*id.* at 408-9, 437-8). Just before the trial of this case, Layne was again allowed to plead guilty to reduced charges in a case including charges that he lied to police about his identity *(id.* at 409-10, 438-9).

## The Facebook Instant Messages

Electronically stored Facebook Instant Messaging conversations and photographs went into evidence notwithstanding the lack of authentication by a

13

person who had observed the scene depicted or who was a party to the conversation. A Facebook representative testified regarding the business' record preservation policies (Nick T. 521, 525-6; 527-528). The witness could not verify who set up accounts or inputted data; she could only testify that Facebook records showed exchanges of data between accounts (Nick 538-9).

One private Facebook communications (an "IM") took place a month before the shooting between an account bearing Defendant's nickname, Shottie Bugatti, and that of Kayla Banks. Shottie Bugatti asked Banks to "hold the chop", which a police witness testified was slang for a hand gun (*id.* at 568). Banks seemed to agree to do so. Nothing in the conversation identified the "chop" (H. 10-11; Nicks T. 529; Vickery T. 568-9).

Before trial, the court overruled defense counsel's motion to exclude the conversation as hearsay and insufficiently connected to the crimes on trial because Defendant was not charged with weapon possession during February 2014 (H. 11; Nicks 529). Over objection, the court also allowed into evidence a March 9, 2014 conversation in which Shottie Bugatti said to "RevRun Nally" that he was looking for "eighty shells" (H. 15-6; Nick T. 530; Vickery T. 569-71). On the afternoon of March 14, 2014, there was an exchange in which Shottie Bugatti asked "Kemmy Dtb" about "food for eighty" and discussed sums of money for "eighty bells."

14

According to a police witness, the conversations were efforts to obtain ammunition for a .380 firearm (T. 117-120; Vickery T. 572-3; Nicks 534-5).

Five undated photographs of Defendant and "Devon" were posted on the account of Shottie Buggati on March 13 and 14, 2014 (Nicks T. 530-1). They appeared to depict Defendant holding a firearm resembling the Gun (Nicks T. 530-4, 540-1; Burnett T. 172-5). According to a police expert, the firearm in the pictures looked like the Gun (Burnett T.168-9, 170-4; Liguori T. 338-41, 347).

In objected-to Instant Messenger conversations held one week after the Kelly homicide, Shottie Bugatti appeared to be trying to obtain ammunition for a .380 firearm and trying to sell to trade or sell "this 80" (Liguori T. 349-52, 353, 371-2; Vickery T. 573-5). Over a relevance objection, the court admitted the conversations (Liguori T. 351, 354-5; Nick T.529 -30). Also over objection, the court allowed a Facebook messaging exchange between Shottie Bugatti and another account on April 2, 2014, in which the other person expressed hope that Kayla Banks would not be "a rat" and "Shottie Bugatti" appeared to agree (Liguori T. 363-5, 369-374; Nicks T. 535-6; Vickery T. 575-6 ).

## Burnett's Recantation and Ensuing Plea Agreement to Reduced Charges

Because he was present for the shooting, Burnett was well aware of the severity of the case when he was arrested for the Kelly homicide. Burnett changed his status from suspect to witness - and shifted police attention away from

15

Kennedy - when he told authorities that Defendant had been the shooter (*id.* at 217-9). Authorities never charged Burnett with any crime in connection with his role in the Kelly homicide. At liberty during this period, Burnett committed violent robberies near his home. Burnett described his *modus operendi* as follows: "I put somebody in a choke hold, took their stuff" (*id.* at 219-20). On the stand, Burnett refused to say how many robberies he had committed (*id.* at 279).

Prosecutors did pursue charges against Burnett for two robberies committed within months of his release on the Kelly homicide (*id.* at 220-1). Prosecutors let Burnett enroll in the CASES program (*id.* at 221-3). His "progress" was not stellar; he was caught violating CASES rules "like four times" (*id.* at 224-5). Yet, the District Attorney allowed the charges to be dismissed at the end of the probation. At trial, Burnett refused to answer questions relating to pending assault charges relating to events that took place on June 4, 2015, one year after the robbery plea deal (*id.* at 279, 291). Burnett also refused to testify how many other times he had been arrested since the Kelly slaying (*id.* at 279).

By August 2015, the People's case was falling apart. With his criminal defense attorney nearby to represent him on a pending misdemeanor case, Burnett met with Defendant's attorney in a corner of a courtroom. Burnett told the attorney that Defendant was not the person who had shot and killed Mr. Kelly. Burnett

16

refused to identify the shooter. At the time, Burnett was not incarcerated (*id.* at 280, 291-2). But that would quickly change.

The same month, Burnett was "shot at" by "Tay." At least that was what Burnett said at this trial. Burnett did not report the crime to the authorities with whom he had been conferring regarding the Kelly homicide. Instead, he rounded up some friends, including two who were present for the Kelly shooting: Mack and Danilo. Danilo was armed with a gun.

The group went to a barbeque/family day being held at the park across the street from the Burnett/Kennedy Apartment and, in Burnett's words, the group found Tay, "[s]o, he can be shot at" (*id.* at 229, 276). And that is exactly what happened. Burnett enticed Tay to a location in the midst of the family/picnic event. At Burnett's behest, "… [t]here was a shoot-out" between Danilo and Tay (*id.*at 229). Tay was not injured, but two bystanders were not so lucky. One was shot in the arm and the other was hit in the leg (*id.* at 229- 231).

Burnett's days of liberty were finally over. He was charged with offenses that carried a 25 year maximum. The DA's plea offer was 10 years' incarceration, but Burnett did not take the deal (Burnett T. 284, 304). Meanwhile, the trial date in this case was approaching fast. After the recantation to defense counsel, a detective approached Burnett because of police concern about whether he was still planning to testify that Defendant was the shooter in the Kelly case (*id.* at 278).

17

By the time of trial, the People had entered a plea agreement with Burnett that guaranteed he would testify in accordance with his original statement exonerating Kennedy, and himself, in the Kelly case. One week before trial, Burnett was allowed to plead guilty to a reduced charge in the Park shooting, and to waive his right of appeal. In return, the People dropped the sentence from 10 years to 4 years. As Burnett put it, "They say if I testify, I get four years" (Burnett T. 232). Burnett's understanding was that, if he "perjured" himself in the eyes of the People, they would ask that he be sentenced to 15 years (*id.* at 232). In other words, if Burnett testified that his recantation to defense counsel was truthful, he would probably have to serve an additional 11 years for the Family Picnic shootings (*id.* at 232).

At trial, Burnett followed the drill. He said that he had lied to Defendant's attorney. The excuses he gave were: (1) Defendant's mother had asked Burnett to talk to the defense attorney; (2) Burnett's friend had been in the courtroom earlier, but was not part of the conversation with Defendant's attorney; (3) six months earlier, Defendant's cousin had "said something about me telling or something. Then we just went our separate ways"; and (4) Defendant's friends had referred to him as a "rat" (Burnett T 293-9, 302). Burnett did not testify that he was threatened physically.

The Defense

18

Fleeing the Shooting, Burnett yells to Kennedy, "…You Laid Him Out with One"

There was one witness with no stake in the outcome of this case who had observed the actions of Donte Kennedy, Burnett, Layne and Danilo on Grand Avenue as they fled the shooting. Jonathan Pachucki was returning from his bartending job at about 4 a.m. on March 15, 2014 (Pachucki T. 546-7). As he approached Grand Avenue, he heard a single gunshot. He recognized the sound because he had heard it "plenty" of times before (*id.* at 557).

The bartender became alert to his surroundings. He then saw that three young men were approaching from behind him on the opposite sidewalk of Grand Avenue, walking quickly in the same direction as he was travelling *(id.* at 549-50, 555, and 557). This was consistent with the testimony of Burnett and Layne that they had fled down Grand Avenue with Donte Kennedy and Danilo. Defendant and Mack were no longer with them by that time (Burnett T. 192-3, 265; Layne T. 401-2, 434).

As the three men caught up to the bartender, who was walking on the other side of the street, Pachucki called over to them, "What's up"? They did not respond, and passed him, putting Pachucki in a position to observe them as they continued on Grand Avenue (Pachucki T. 548). Then, the bartender noticed a fourth person, who was about 6 feet tall, trailing about 25 feet behind the other

19

three. Burnett had testified that Kennedy was the tallest member of the six people present for Kelly's slaying (Burnett T. 202; Pachucki T. 549).

Pachucki had observed that one member of the group of three in front had his hair pulled back in a ponytail. At trial, Burnett had testified that, at the time of the shooting, he wore his hair long and pulled back in a ponytail, which was confirmed by the video and still photos in evidence (Burnett T. 206, 259). Surveillance images also showed that Burnett and Donte Kennedy, were travelling down Grand Avenue at just that time, but not Defendant (Burnett T. 237, 239-40, People's Exhibit 39-40). Three of the men were in front, and the fourth was trailing the others, just as Pachucki had testified (People's Exhibit 39).

When the group of three were about 20 feet in front of Pachucki, the pony-tailed man turned around to address the person behind them, and said to him, "Damn, son, you laid him out with one" (*id.* at 548-9, 556, 559-60). The independent witness reported his observations to police two days later (*id.* at 560).

The Prosecutor's Bolstering and Jury Arguments with no Evidentiary Basis

The prosecution did not call Donte Kennedy to testify. Yet, during his Opening statement, the prosecutor asserted that a "detective spoke to Donte Kennedy who had also been with the defendant [at the time of the shooting of Mr. Kelly]. Donte Kennedy named the defendant Victorious Kingsberry his friend who he called Shottie as the person who committed the murder" (T. 39-40).

20

During Burnett's direct examination, the prosecutor had the witness identify "Mills" and "Capo" as people in the audience of the courtroom (*id.* at 165). The ADA asked Burnett if he recognized anyone else there, and the witness responded that he knew "everybody" present in the courtroom (*id.* at 166).

At the beginning of the Closing Statement, the prosecutor asserted that "…it's the People's argument that Tyquan Burnett is telling you the truth. In fact, Tyquan Burnett's testimony in and of itself was so powerful and so accurate that in and of itself it proves all the charges beyond a reasonable doubt" (T. 626). The vouching continued throughout the closing: "… [A]sk yourself is Tyquan Burnett truthful and accurate? Is he telling me the truth? And the answer is yes" (T. 627-8).

Again referring to matters not in evidence, the prosecutor asserted that Burnett "was the one who told you that he let this defendant" keep the Gun in the Burnett/Kennedy Apartment (T. 629; see also T. 653 ["The defendant kept a gun often times – not always, often times he kept it at Tyquan's apartment"]; T. 654 ["… [The Gun] is always somewhere where the defendant wants it to be"]). The prosecutor also stated that Defendant "owned and frequently possessed" the Gun, stating that "[Layne] and Burnett agree it was always [Defendant's] gun" (T. 645). Yet, neither witness had testified that Defendant was the "owner" of the Gun or why the firearm had been kept at the Burnett/Kennedy Apartment for weeks at a time.

21

The court overruled defense counsel's objection to the prosecutor's summation assertion that "all these folks out in the audience, friends of the defendant" had created pressure on Burnett that caused his recantation to the defense attorney months before the trial began (T. 637). Later, he argued that Burnett appeared uncomfortable on the witness stand because, "When he …testifies against this defendant, it's over. He is completely ostracized" (T. 637).

The prosecutor gave a detailed review of his own internal decision-making process in offering the generous cooperation agreement to Burnett days before the trial began:

"[Burnett] is sitting at Riker's [on the 2015 Family Picnic shooting case]. He has a lawyer. If nothing is done, his case will drag out for a year in the court system as well…..So, how could this have played out [absent a cooperation agreement]. You would have to have a crystal ball to know exactly how it would have played out without a cooperation agreement, this is one thing that might have happened. We could have just picked a jury, thrown Burnett up there without a cooperation agreement and say, let's see what happens, right, and we can just keep our finger crossed and hope that out of the goodness of his heart he tells everybody what he saw on Grand Avenue…and let's just hope that while he is up there he never says to himself, wait a minute, I'm going to testify against Victorious Kingsberry….And then I'm going Upstate on my own case for how long, and I'm going to spend how many years in jail as a snitch when this trial is over? He is never going to ask himself that question?

Time out. This case is getting to be a year and a half old. We are going to pick a jury, and it's very, very important if you think it's very important for this jury to hear testimony from Tyquan Burnett, then you got to cut the deal. Might not love it, might not make you happy, but if you want the jury to hear his testimony, you got to wrap up his case and he has to know what he is getting at the end of the day."

22

(T. 639-40).  The court overruled defense counsel's objection to the prosecutor's argument (T. 640).

The prosecutor made similar inappropriate arguments about Matthew Layne, asserting he "testifie[d] under oath in the grand jury and goes on record saying that this defendant did the shooting" (T. 642-3).  There had been no trial testimony about what Layne had said during his grand jury appearance.

## The Post-Evidence Motions and Jury Charge

At the end of the People's case, the defense moved to dismiss on the grounds that the prosecution had not established a prima facie case "in all of the charges that would go to the jury..." (T. 579).  In response, the prosecutor argued that the evidence of the identity of the shooter was sufficient, citing the two trial witnesses who were present, the photographs of Defendant posing with a firearm resembling the Gun posted on social media in the days before the crime, and the evidence of Defendant's apparent efforts to sell a gun after the shooting (T. 579).  The court denied the motion (T. 578-9).  The court also denied the defense motion, at the close of the evidence, made just a few minutes later, to dismiss the charges on the grounds that the People had failed to prove the charges beyond a reasonable doubt, pointing specifically to the lack of proof of an intent to cause death (T. 581-2). Defense counsel cited the evidence that the death was caused by a single shot across a street and the person with the Gun might have been trying to scare Mr.

23

Kelly. There was no evidence that Defendant had said he was trying to hit him with a bullet (*id.*) The court denied that motion as well (id., at 583).

Defense counsel did not request a jury instruction on the accomplice-in-fact testimony given by Tyquan Burnett and Matthew Layne. The court did not instruct jurors on the applicable law requiring the jury to determine whether the testimony given by the two accomplices was corroborated by independent evidence (*see* CPL 60.22).

The court asked defense counsel if the jury should have the option of consider the lesser offense of manslaughter in the first degree. The attorney responded in the affirmative, and the court instructed jurors on the manslaughter offense that requires proof of "the intent to cause serious physical injury to another person" (T. 585-6; 692). However, defense counsel did not request a charge on manslaughter in the second degree, recklessly causing death (Penal Law § 125.15) and the court did not give the option to the jury.

Defense counsel did not ask for a jury charge on the law concerning intoxication and its potential impact on determining the intent element of the offenses (see Penal Law § 15.25). Consequently, the court did not give any instruction on the subject. During deliberations, the jury asked for a re-read of the instructions on "intent" (T. 705-6).

The Verdict and Sentencing

24

The Jury found Defendant guilty of the crimes of murder in the second degree and criminal possession of a weapon in the second degree (T. 715).

At Defendant's March 7, 2016 sentencing, defense counsel did not make any arguments in favor of a sentence on the shorter end of the possible range. He simply asserted that his client maintained his innocence and that the Facebook entries were improperly admitted into evidence (S. 11). The court rendered sentence without explaining its reasons. The terms of incarceration were twenty-three years to life for the murder, and a concurrent fifteen years for the weapon possession (S. 12).

## POINT ONE

### THE PROSECUTION PRESENTED LEGALLY AND FACTUALLY INSUFFICENT EVIDENCE THAT DEFENDANT FIRED A GUN OR HAD THE INTENT OF CAUSING DEATH.

Gilbert Kelly was shot to death with a single bullet on a Brooklyn sidewalk by one of six men who had spent the prior day and night drinking and smoking pot together. Police quickly recovered street videos of the men before and after the shooting. Two of the six were best friends: Tyquan Burnett and Matthew Layne. When police questioned them, they could not deny being present at the shooting because the videos showed they were there. The good friends accused Defendant of the crime, and appear to have avoided any prosecution for the roles they and Kennedy had played in the events.

25

Two days after the shooting, an independent witness had come forward to describe how Burnett had congratulated Kennedy, as they fled the shooting, with the words: "Damn, son, you laid him out with one." Kelly had been slain with a single bullet. Police and prosecutors should have been more cautious about accepting Burnett's and Layne's uncorroborated, and contradictory, versions of what took place that night. Not long before trial, Burnett told defense counsel that Defendant was not the shooter, and only reverted to his original statement upon receiving a very substantial incentive from the District Attorney.

The evidence was insufficient to prove that Defendant was the person who committed the crimes in the course of this street encounter, or that he did so with the intent to cause death.

The conviction should be reversed.

The Law

The defense motion seeking an acquittal at the close of all of the evidence clearly cited the weak evidence on intent and was "sufficiently specific to alert the court to his position" (*People v. Mais*, 133 AD3d 687 [2d Dept. 2015]). Accordingly, the issue has been preserved as a question of law (CPL § 470.05). In addition, at the close of the People's case, defense counsel made a general motion to dismiss all charges, and the prosecutor responded by arguing exclusively on the subject of the sufficiency of the identification evidence, marshalling its evidence

26

introduced for that purpose. Because the court's denial of the motion came after the identification issue was placed squarely before it, the question of the sufficiency of the evidence of the identity of the shooter has been preserved as a matter of law as well (*see People v Prado,* 4 NY3d 725 [2004]).

But if not sufficiently presented as a question of law, this Court should review the sufficiency of the evidence of identity as a matter of discretion in the interest of justice (CPL § 470.15; see *People v. Small,* 74 AD3d 843 [2d Dept. 2010]), because that issue was the focus of the trial evidence, and attorney arguments. The sufficiency of that evidence, went to the very heart of the trial's purpose, and the fairness of the proceeding.

Evidence is sufficient as a matter of law when, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (*People v Contes.* 60 NY2d 620, 621 [1983] [emphasis omitted], quoting *Jackson v Virginia,* 443 US 307, 319 [1979]).

Moreover, even when evidence is legally sufficient, a court has factual review power to set aside a verdict as against the weight of the evidence if it finds "the 'trier of fact has failed to give the evidence the weight it should be accorded'" (*People v. Cahill,* 2 NY3d 14, 58 [2003], quoting *People v Bleakley,* 69 NY2d 490,

495 [1987]). This power of review does not require preservation (see *People v. McFadden*, 106 AD3d 1020, 1022 [2d Dept. 2013).

Upon a    defendant's request,    the Appellate Division must    conduct a weight of the evidence review (CPL 470.15 [5]). The Appellate Division "serve[s]…as a second jury", or as a "thirteenth juror" (*Tibbs v. Florida*, 457 U.S.31, 42 [1982]) when it reviews a case in order to determine whether the verdict is against the weight of the evidence *(People v. Delamota*, 18 NY3d 107, 117 [2011]). The court's power to "rectif[y] an unjust conviction" (*id*) permits it to address not only questions of credibility, but also the elements of the crime (*People v. Danielson*, 9 NY3d 342 [2007]; see, *People v. Cahill,* 2 NY3d at 58, *supra*). Accordingly, the Appellate Division has a "special power [which obligates it] to affirmatively review the record; independently assess all the proof; substitute its own credibility determinations for those made by the jury in an appropriate case; determine whether the verdict was factually correct; and acquit a defendant if a court is not convinced that the jury was justified in finding that guilt was proven beyond a reasonable doubt [citations omitted]" (*People v. Delamota,* 18 NY3d at 116-17, *supra*).

An appellate court weighing the evidence "must, like the trier of fact below, 'weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony' " (*People v*

*Bleakley*, 69 NY2d at 495 , *supra*, quoting *People ex rel. MacCracken v Miller*, 291 NY 55, 62 [1943]). "If based on all the credible evidence a different finding would not have been unreasonable" and if the "trier of fact has failed to give the evidence the weight it should be accorded, then the appellate court may set aside the verdict" (*id*).

Under weight of the evidence review "[e]ven if all the elements and necessary findings are supported by some credible evidence, the court must examine the evidence further …[and] must…weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony … If based on all the credible evidence a different finding would not have been unreasonable and if the trier of fact has failed to give the evidence the weight it should be accorded, the appellate court may set aside the verdict" (*People v Cahill*, 2 NY3d at 57-58 [citations and internal quotation marks omitted]).

If the verdict of guilt was not against the weight of the evidence, the court may reverse the judgment, and dismiss the indictment, in accordance with its interest of justice jurisdiction (*see*, CPL 470.15 [3] [c]). It does so when the evidence "leaves [it] with a very disturbing feeling that guilt has not been satisfactorily established; that there is a grave risk that an innocent man has been convicted" (*People v Gioeli*, 288 AD2d 488, 489 [2d Dep't 2001] [internal

29

quotation marks omitted]; *see People v Carter*, 63 NY2d 530, 536 [1984]). The court's broad and discretionary power includes a "duty to correct any situation casting doubt upon the proper functioning of the courts in the administration of justice" (*People v Kidd*, 76 AD2d 665, 668 [1st Dept. 1980], *appeal dismissed* 51 NY2d 882 [1980]).

Additional proof of guilt is required when accomplice testimony is part of the People's case. To address the problematic credibility of accomplices, CPL 60.22(1) requires "corroborative evidence tending to connect the defendant with the commission of such offense." The corroboration requirement may be satisfied by evidence that is independent of the accomplice's words or that "harmonizes' with it (*People v. Reome*, 15 NY3d 188, 194 [2010]). While the corroboration need not show the defendant committed the crime, it must satisfy the jury that that the accomplice is testifying truthfully (*id.* at 191-2).[2]

## The Incentives and Loyalties of the Witnesses

Burnett and Layne had multiple incentives to testify in a self-serving manner, triggering the corroboration requirement. These best friends were captured on videos on the night of the murder, and questioned by authorities well over a

---

[2] Point II addresses the trial court's failure to charge the jury regarding the additional burden of proof for accomplice witnesses and, of its need to determine whether any of the witnesses were accomplices for these purposes. This Point includes a discussion of whether the People presented the required corroboration of the accomplice witnesses

week after the crime. There was plenty of time for the two and Donte Kennedy to discuss the case.

"[T]he purpose of the accomplice corroboration statute is to protect the criminal justice system from the risk of fabricated testimony when witnesses have strong incentives to deflect police attention (*People v. Daniels,* 37 N.Y.2d 624 [ 1975]). Burnett and Layne participated in all of the events leading up to and after the shooting. They or Kennedy could have been charged with a role in the homicide as well as the weapon possession, particularly in view of the independent witness' report that Burnett had congratulated Kennedy of "laying" someone out with "one." Police must have originally taken that report seriously, as Burnett was arrested for the Kelly homicide at a time the murder weapon was still stowed in his bedroom. By pointing the finger at Defendant, he managed to avoid all charges. He must have been very convincing. Authorities released him, and he was back at the Burnett/Kennedy apartment, continuing his violent robbery spree.

The statutory corroboration requirement for accomplice witnesses was applicable in this case given Burnett and Layne's exposure to possible prosecution for the shooting. If two wrongs do not make a right, then the conforming testimony of two accomplices in the same position cannot provide the required corroboration (*People v. Ohlstein,* 54 AD2d 109 [1ˢᵗ Dept. 1976], aff'd 44 NY2d 896 [1978]). The People presented no evidence that tended to connect Defendant to the

31

shooting, other than his presence at the scene on his way back from attending a party with the others. That circumstance did nothing to resolve the underlying risk of relying on the accomplices' words because there was no corroboration of Burnett's and Layne's testimony that Defendant was the one who had shot Mr. Kelly, to the exclusion of the other five men with identical motivations and access to the Gun.

But even if the accomplice corroboration requirement did not apply, the testimony was problematic for the same reasons that the law imposes an additional burden of proof in such cases: the two witnesses had every incentive to put responsibility on others. Burnett acknowledged frankly that the Gun was in his bedroom before the six men went to the party, and for 10 days after the shooting.

Burnett's and Layne's testimony was characterized by internal contradictions and were not consistent. One example of the self-serving and less-than-credible nature of their words was obvious when defense counsel asked Layne if he had talked with Burnett or Kennedy about the shooting in the aftermath. Layne claimed that they had not exchanged a single word on the topic. This was after he, Burnett and Kennedy had purportedly watched a man be shot to death, had fled the scene, and stowed the murder weapon at the Burnett/Kennedy Apartment. No, Layne testified, we did not speak a word about the events. Not once. If Layne was truthful, there was a coldness in his heart that eludes human

32

understanding. The more likely explanation is that there was lots of talk among the three, and Layne was untruthful on this point because he believed it was in his self-interest.

Try as the People may claim to characterize Layne as a fully credible witness, his efforts to protect himself, and others, created strange holes in the prosecution case. For example, Layne testified that he did not carry the Gun to the party, and the other five people with him were frisked by police while he was inside a restaurant. Layne testified that Kayla was not with them at the time. Either Layne was carrying the Gun, or he was lying about Kayla's presence. A third possibility is that Layne's friend, Burnett, invented the testimony describing how his group had carried the Gun to the party. Either Burnett or Layne was untruthful on a significant issue in the case.

Layne's respect for the criminal justice system was hardly of unimpeachable quality. He had pled guilty to assaulting a police officer during a domestic disturbance call at his home, and then lied to another officer about his identity. At every possible turn of his testimony, Layne tried to minimize his role, even claiming that he did not throw fruit at Mr. Kelly, in contradiction to Burnett's own recollection. Layne's approach was consistent; he said what he thought was needed, putting his own needs and those of his and close friends first.

The Eve-of-Trial Plea Bargain

33

The People will undoubtedly remind the Court of a reality it knows well: at times, prosecutors must give incentives to witnesses in order to obtain needed testimony. In this case, the structure of the "bargain" made with Burnett guaranteed that he would testify in a certain way. Burnett had recently told defense counsel that Defendant was not the person who shot Kelly. Then, days before trial, prosecutors reduced their plea offer on an unrelated case; the offer went down from ten years' incarceration to four. There was a condition that guaranteed Burnett testified in accordance with the indictment. If the People believed he was not truthful, prosecutors would recommend a sentence of fifteen years. In other words, Burnett obtained a sentence that was six years lower than the previous offer if he testified in the Kelly homicide. If prosecutors were displeased with the testimony, he would do an additional eleven years.

This Court cannot have confidence in Burnett's testimony in view of the extreme incentives created by that "deal", particularly in view of the witness' recantation just months earlier. The disproportionate motivation created a strong incentive for Burnett, and his best friend Matthew Layne, to continue to accuse Defendant of the crime. Moreover, the prosecution's explanation for Burnett's decision to recant to defense counsel was hardly compelling. No one had threatened him to do so, and Tyquan Burnett was not a young man who was easily intimidated. (see *People v. Kress,* 284 N.Y.452, 459 [1940]).

34

Indeed, the only independent evidence regarding who committed the crime was the observations of the independent witness, who heard words that tended to confirm that Kennedy, and not Defendant, was the person who shot Kelly with a single bullet. As he faced the prospect of trial, Burnett told the defense attorney that Defendant was not the one who did so.

As for Layne, his general lack of willingness to cooperate with law enforcement officers is a matter of record. He was convicted of assaulting a police officer and lying to another police officer to avoid arrest. He consistently minimized his potential criminal role in describing the night of the shooting. He claimed that he did not see the Gun on the trip to the party and denied throwing fruit at Mr. Kelly.

The only evidence that Defendant committed the shooting was the words of these best friends who admired Donte Kennedy.

The Murder Weapon's Role

The prosecutor was determined to prove that Defendant "owned" the firearm. In truth, "ownership" was not really the issue as the indictment did not charge Defendant with possessing the Gun at any time other the moment of the shooting. Viewing the evidence in the light most favorable to the People, the People's evidence showed that Defendant had posed in pictures with a firearm that looked like the Gun on unknown dates. He also seemed to attempt to buy

35

ammunition for a firearm of the same common caliber as the Gun and tried to sell an unidentified a firearm of that caliber. Burnett testified that Defendant carried the Gun on the street. That said, neither Burnett of Layne testified that Defendant "owned" the Gun or was in charge of it.

Like the dog that did not bark in the famous Sherlock Holmes tale, the testimony that Burnett and Layne did not give is quite telling. The prosecutor never asked the two witnesses directly who owned the Gun, and the witnesses never addressed the question directly. Nor did the two witnesses provide any information on the subject of whether Defendant had instructed others about the Gun's movements or use before or after the Kelly shooting.

In a typical case in which an individual carries and keeps a weapon to the exclusion of others, photos of that person posing with the weapon, or trying to sell it or obtain ammunition could be persuasive on the issue of its use at the moment of a shooting. In this case, however, many different people carried, handled and hid the Gun. The Facebook photos and IM's may have been evidence that Defendant was one of the many who had touched the Gun. It provided little support for the People's effort to prove Defendant possessed it when Kelly was shot during the early morning hours of March 15, 2014.

The Only Independent Witness

36

There was one witness to the events on Grand Avenue with no reason to lie, the only "adult" who could describe to the jury what had taken place that night. He got nothing for himself or his friends by coming forward. That person was the bartender who was walking home from work and heard a gunshot. The sound made him vigilant, and he took note when he observed Tyquan Burnett pass him with two others and then turn to praise Donte Kennedy for "[laying] him out with one." The bartender surely was relieved to get home safely after that chilling moment.

Two days later, the witness reported his observations to police. His memory was remarkably accurate. He recalled that one of the three men heading down Grand Avenue had a pony-tail; that was Burnett, as the videos proved conclusively. He also described a taller person lagging behind the other three, conforming to incontrovertible video images. Burnett had congratulated Kennedy for having "laid" out someone with "one." Kelly was slain by a single bullet.

It is not every day that a civilian witness provides such clear and unbiased information that was readily confirmable by reviewing video evidence. The Office of the District Attorney preferred to rely on Burnett and Layne. It is not easy to understand why.

## The Lack of Proof of Intent to Murder

Penal Law § 15.05(1) provides, in pertinent part, that "[a] person acts intentionally with respect to a result ... when his conscious objective is to cause

such result." As this Court has articulated the standard, "... [F]or an intentional crime, the perpetrator must engage in conduct with the conscious objective and purpose of causing a particular unlawful result" (*People v. Atkinson*, 21 AD3d 145, 148 [2d Dept. 2005], mod., 7 NY 3d 765 [2006]). If the Court credits Burnett's and Layne's testimony that Defendant shot Mr. Kelly, there was insufficient proof that he had the conscious objective of causing Mr. Kelly's death.

The group of six men had been drinking and smoking marijuana for at least 18 hours preceding the shooting. The 4 a.m. encounter took place as they were returning from a party, throwing fruit at strangers on the sidewalk as they walked, undoubtedly still affected by their alcohol consumption and drug abuse. The unfortunate collision occurred when an undoubtedly frightened homeless man reacted strongly to the fruit throwers. He pulled out a knife and yelled at them forcefully to get off of "his" street.

The group did not think Mr. Kelly's ferocious response was a joke. They ran across the street and hid behind cars parked on the other side. If Defendant was the person who shot, he did so only after Elijah Mack handed the gun to him, and none of the others told Mack not to do so. All six of them were afraid.

The shooting of a single bullet in Kelly's direction over two rows of parked cars, and two lanes of street, was a reckless act. But this evidence was not sufficient to support the People's theory that the exhausted and impaired shooter

had the conscious objection of causing death. For that additional reason, the murder conviction should not stand.

## POINT TWO

### THE COURT'S FAILURE TO INSTRUCT THE JURY REGARDING THE ACCOMPLICE WITNESS CORROBORATION REQUIREMENT DEPRIVED DEFENDANT OF A FAIR TRIAL.

The People's case relied exclusively on the testimony of two men who participated in the crimes committed that night: Burnett and Layne. Without their testimony, there could have been no indictment or conviction of Defendant. Even in the face of defense counsel's failure to request the necessary jury charge on accomplice corroboration, this Court's precedent warrants reversal of this case in the interests of justice *(People v. Mohammed,* 81 AD3d 983 [2d Dept. 2011]). In the alternative, as set forth in Point IV below, the omission constituted ineffective assistance of counsel.

"The law recognizes that accomplice testimony is inherently untrustworthy because those charged with a crime often seek to escape the consequences and curry favor with officials by implicating others" (*People v. Sweet,* 78 N.Y.2d 263, 267 (1991). For that reason, New York imposes an additional evidentiary burden on prosecutors using such witnesses. The relevant statute provides:

"A defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense

39

(CPL § 60.22 [1]).

A witness need not be criminally liable for the offense to be considered an accomplice for the purposes of the corroboration requirement (*People v. Berger*, 52 NY2d 214,219 [1981]. As CPL § 60.22[2] makes clear, the corroboration rule applies to witnesses who "may reasonably be considered to have participated in the offense charged, or an offense based upon the same or some of the same facts or conduct which constitute the offense charged (*People v. Basch*, 36 NY2d 154, 156-7 [1975])" (*People v. Leon*, 121 AD2d 1, 6 [1st Dept. 1986], lv. den., 69 NY2d 830 [1987]) (emphasis added). This Court has described the witness whose complicity requires corroboration as a witness who is "a criminal facilitator" (*People v. Riley*, 152 AD3d 719, 720[2d Dept. 2017] [reversing a murder conviction]).

In *People v. Leon*, supra, at 6, the court found that "the risks addressed by the accomplice-corroboration rule [were] sufficiently implicated, to have warranted the submission of his accomplice status to the jury as an issue of fact" (id.). The witness in *Leon* had been present throughout the crime, and had driven the defendant to the scene, without getting out of the car (id. at 7). Given the conflicting inferences a fact finder could draw about the witness' possible incentives to testify in a self-serving manner, the "duty then rested on the Trial Judge to offer to instruct the jury" regarding the accomplice corroboration requirement (*id.* at 8).

Recently, this Court reversed in the interest of justice a murder conviction in a case that is very similar to this one. In *People v. Powell*, 165 AD3d 842 (2d Dept. 2018), the defendant was convicted of murder in the second degree, and criminal possession of a weapon. The primary evidence for the prosecution was a witness who testified that he saw the defendant shoot the victim. After the slaying, the witness picked up the gun, and fled with the defendant to the witness' home (*id.* at 843). Later, police recovered the weapon from the garbage compacter of the building where the witness lived, which was not the defendant's home. DNA analysis disclosed that the witness had touched the gun at some point in time.

As is true here, defense counsel failed to request an accomplice corroboration charge, an omission with no strategic advantage to the client. This Court reversed, finding the trial court's failure "to provide the jury with an accomplice-in-fact instruction" constituted one of the grounds warranting a retrial of the case (*id.* at 843). In the Court's words, "Since different inferences could reasonably be drawn from the witness's testimony and from the forensic evidence as to the witness's role as an accomplice (see CPL 60.22), the lack of an accomplice corroboration charge also warrants a new trial (see *People v. Sage*, 23 NY3d16 [2014]; *People v. Douglas*, 160 AD3d 436 [1st Dept. 2018]; *People v. Riley*, 152 AD3d 719 [2d Dept.] [leave denied 30 NY3d 982 920170])" (*id.* at 844; see also *People v. Shelton*, 98 AD3d 988, 988-89 [2d Dept. 2012)] [failure to

41

submit to the jury the factual question of the witness's accomplice status was one of two grounds for reversal in the interest of justice]); *cf. People v. Tusa,*137, A.D.2d 151, 155-56 [2nd Dept. 1988], lv. den. 72 N.Y.2d 1050 [1988]).

The two accomplice witnesses in this case can "reasonably be considered to have participated" in the offense tried or another "offense based upon the same of some of the same facts of conduct with constitute the offense charged" (CPL 60.22 [2]). All six of the party-goers had collaborated in the transportation of the Gun that night from Burnett's home to the location of the shooting, and Defendant did not possess the firearm when the group came upon Mr. Kelly on a City sidewalk. Earlier that night, they had all handled the firearm and had participated in the intimidation of Mr. Kelly on the City sidewalk, yelling and pelleting him with stolen fruit.

After the six ran and hid behind cars, one of them killed Mr. Kelly. The sole prosecution evidence regarding who fired at the victim came from two members of the group that intimidated Mr. Kelly. As they fled the scene, an independent witness heard Burnett congratulate Kennedy for having "laid" someone out with "one." Later, the two witnesses had plenty of time to discuss what they would tell authorities.

Burnett and Layne could very "reasonably be considered" to have participated in the crimes that night under an aiding and abetting theory. Indeed,

42

Burnett was arrested for the crime. Under these circumstances, the jury should have been instructed about the accomplice-corroboration rule. As it was, the finders of fact had no way to know of the additional burden of proof that the People were required to satisfy before they could convict. It is a fundamental error that mandates a new trial.

## POINT THREE

## DEFENSE COUNSEL'S FAILURE TO MAKE ESSENTIAL MOTIONS AND OBJECTIONS CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL

The Federal and State Constitutions guarantee defendants the right to the effective assistance of counsel (US Const, 6th and 14th Amdts; NY Const, art I, § 6). The federal standard for determining effectiveness of counsel is a two-prong test: whether (1) the attorney's performance "fell below an objective standard of reasonableness" and (2) the prejudice, meaning there was a "reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different" (*Strickland v. Washington*, 466 US 668, 688, 694 [1984]).

The New York Constitution does not require a defendant to satisfy the full *Strickland* prejudice test (see *People v. Stultz*, 2 NY3d 277, 284 [2004]. A defendant claiming ineffective assistance of counsel must show that the attorney

did not provide "meaningful representation" (see, *People v Benevento,* 91 NY2d 708, 712 [1998]; *see, People v. Nicholson,* [2016]). While the degree of ineffectiveness of counsel "cannot be fixed with yardstick precision" (*People v. Baldi*, 54 NY2d 137, 146 [1981), "...it is elementary that the right to effective representation includes the right to assistance by an attorney who has taken the time to review and prepare both the law and the facts relevant to the defense...and who is familiar with, and able to apply at trial basic principles of criminal law and procedure" (*People v Droz*, 39 NY2d 457, 462 [1976], citing *People v. LaBree*, 34 NY2d 257 [1974]); *see People v. Oliveras*, 21 NY3d 399 [2012]).

An appellate court reviewing an ineffective assistance of counsel claim must examine whether "the evidence, the law, and the circumstances of [the] particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation" (*People v Baldi*, 54 NY2d at 147; see *People v. Modica*, 64 NY2d 828, 829 [1985]). When trial counsels' overall performance is prejudicially unsatisfactory, having no strategic explanation, the conviction cannot stand (*People v. Raosto*, 50 AD3d 508 [1st Dept. 2008].

Counsel's Performance

44

"It is elementary that the right to effective representation includes the right to assistance by an attorney who has taken the time to review and prepare the law and the facts relevant to the defense" (*People v. Droz*, 39 NY2d 457, 462 [1976]). Counsel's problematic performance in this case had two themes.

In New York State, a defendant may prevail in an ineffective assistance of counsel claim without showing that the outcome of the trial would have been different absent the attorney's derelictions (*People v. Turner*, 5 NY3d 476 [2005]). Under the *Baldi* standard, "a defendant need not fully satisfy the prejudice test of *Strickland*... [because the] focus is on the fairness of the proceedings as a whole" (*People v. Stultz*, 2 NY3d 277, 284 [2004]). "...[E]ven in the absence of a reasonable probability of a different outcome, inadequacy of counsel will still warrant reversal whenever a defendant is deprived of a fair trial" (*People v. Caban*, 5 NY3d 143, 156 [2005]).

Defendant did not have a fair trial because of the cumulative impact of numerous prejudicial blunders in counsel's performance (see *People v. Mehmood*, 112 A.D.3d 850, 854-855 [2d Dept. 2013]; *People v McArthur*, 101 AD3d 752, 754 [2d Dept. 2012], lv. den., 20 N.Y.3d 1101 [2013]).

## The Failure to Request the Accomplice Corroboration Charge

Defense counsel did not request the court to instruct the jury on the law concerning accomplice corroboration. Nor did he object to the omission after the

45

charge was given (see T. 697). As is discussed at length in Point Two above, the charge was required given the witnesses' role in the crime. The only evidence that Defendant was the person who held the Gun and shot Mr. Kelly was the testimony of two people who were themselves suspects, participated in the events leading to the shooting, and did not assist the victim or police investigating the crime until after their own arrests.

Defense counsel's principal defense strategy in this case was to convince the jury that that the People had pursued the wrong person, that Burnett and Layne had falsely accused Defendant in order to protect another person who was part of their group that night. There could have been only one reason that defense counsel did not request the charge. Very probably, it was the very same reason that the trial court neglected to give it. It was a mistake, and it was a very key one that made all the difference in how the jury treated Burnett and Layne's testimony. The omission was one that could have had no tactical advantage to the defense. Given the far from overwhelming evidence in this case, and the defense presented, it was a failure of representation that was fatal to Defendant's right to the effective assistance of counsel.

## The Failure to Request Instructions on Manslaughter in the Second Degree or on the Impact of Intoxication

Defense counsel's failure to request that the court give the jury the option of considering the crime of manslaughter in the second degree or on the law

46

respecting the impact of intoxication could not have been based upon any reasonable strategic decision. A "relatively low threshold exists to demonstrate entitlement" to the instruction. And, as with any defense," the evidence must be viewed in the light most favorable to the defendant" (*People v. Sirico*, 17 N.Y.3d 744, 745-46 [2011][internal quotation marks and citations omitted]; *People v. Perry*, 61 NY 2d 849 [1984]; see CJA2d [NY][Intoxication second degree (see, Penal Law § 15.25). All three counts before the jury in this case required proof of intent to commit the acts involved.

The People's evidence warranted an instruction on the impact of consumption of intoxicants because the uncontroverted evidence was that Defendant had used intoxicating substances to a degree that would have affected his ability to form the criminal intent charged. Burnett and Layne had been frank about how many intoxicants the teens had ingested the entire preceding day and night and the case presented by the People supported an intoxication charge here. Burnett and Layne described themselves as a group of young men who were acting in a manner that was loud and obnoxious. At four in the morning, they thought it was hilarious to pellet pedestrians who happened to be on the sidewalk. There was only one reason for their fruit-assault on strangers: they were drunk and they were high.

47

If instructed regarding the law of intoxication, the jury had good grounds to find that Defendant's actions that night were affected by intoxicants "to negative an element of the crime charged." The failure to request the charge can be attributed to no reason other than a failure to prepare for the charge conference.

Another mistake defense counsel made at that crucial moment was the failure to request the appropriate lesser included offense, manslaughter in the second degree. Since as defense counsel asked that the jury be given the option of considering the lesser offense of manslaughter in the first degree, there could be no strategic reason for failing to request the reckless homicide offense. As discussed above in Point One with regard to the failure of proof of an intent to murder, the evidence was consistent with the shooter acting recklessly, in an emotionally muddled state. All six of the young men were frightened by Mr. Kelly's reaction, and they initially ran away to hide behind cars parked across the street. If Defendant was the individual who took the single shot, there was ample evidence for the jury to believe that he did so recklessly, and not with the intention of killing or seriously harming Mr. Kelly. The shooter was part of a panicked peer group, and aimed his gun in the direction of a man who was nearly 100 feet distant, separated by two rows of parked cars and two lanes for cars to drive.

The chaotic street scene, together with the evidence of Defendant's having ingested intoxicants and the very late hour, provided a reasonable basis for a jury

48

to find that, if he was the person who shot the gun, he was guilty of reckless manslaughter, and not intentional murder. The failure to make that request for the C felony offense could have no reason other than attorney ineffectiveness.

## The Failure to Object to the Weapon Possession Charge Language

During its final charge, the court instructed the jury on the People's evidence of Defendant's involvement with the Gun as follows: "With respect to the defendant, you have heard testimony that the defendant had dominion and control of the gun which the People allege was the murder weapon at a time before the incident as well as a time thereafter" (T. 687). The instruction also told jurors they could use the evidence on the question of "dominion and control over the murder weapon at the time of the incident" but not to consider it as proof of a propensity to "commit crimes" (T. 687).

Defense counsel did not object to the language. It appears to have been a misuse of words that might cause jurors to believe that the judge had found, as a matter of law, that Defendant "had dominion and control" of the gun before and after the shooting (T. 697). If counsel had objected, the court would have surely given a curative instruction. Unfortunately, that did not happen.

## The Failure to Object to the Facebook Authentication

49

Before and during the trial, the court held a hearing outside the jury's hearing on the relevance and potential prejudice of the Facebook photographs and IM conversations. When the Facebook witness testified, she testified concerning the company's operations and record-keeping. At the conclusion of that portion of her testimony, the prosecutor asked to put a disk containing Facebook records into evidence. Defense counsel had no objection after the court stated that it had previously ruled that portions of those records would not be before the jury (T. 526).

Because defense counsel made no objection that the evidence had not been sufficiently authenticated, the court did not have an opportunity to address the issue. As is briefed more fully in Point Five below, defense counsel should have objected to the evidence on those grounds. There was no witness who testified that the photographs were fair and accurate depictions of the events depicted. Nor did any of the participants in the Facebook IM conversations testify. Insofar as his failure to do so could have had no strategic advantage to the defense, the attorney should have objected to the materials on authentication grounds.

## The Failure to Prepare for Trial

Defense counsel waited until the first day of trial to discuss the Facebook postings of the people involved in this case. It became clear during the conference that he had done nothing to prepare for the Facebook photographs evidence, which

50

the judge described as "very powerful evidence" or the IM conversation (H. 4-5). The court stated that it might have treated the evidence differently if defense counsel had subpoenaed photographs of others posing with the firearm. Instead, the attorney demanded, "Make the People have access to the Facebook accounts" (H. 7). The court declined to do so, or to delay the trial for the purpose of rectifying counsel's dereliction of his obligation to subpoena the defense materials in a timely fashion (id.).

The evidence at trial confirmed what defense counsel surely knew. Many others had handled the Gun. By failing to review the Facebook postings of the others involved in this case, the defense could not put the photograph of Defendant in context.

Moreover, based on counsel's comments, it appears that he did not subpoena the IM's and text messages of the other five people present at the shooting. A competent preparation for trial would have included subpoenaing those material for trial, at the very least. The judge was ready to sign the subpoenas. There was no indication at trial from the defense cross-examinations or evidence submitted, that the attorney had done so. In the context of young people who communicated so frequently in that fashion, there could have been no strategic reason for failing to do so.

The Failure to Advocate for a Lower Sentence

51

Defense counsel said nothing on behalf of his client at sentencing. His only comments were that Defendant continued to deny his guilt and that the court had erred in admitting certain evidence. That was it. At the very least he should have said something positive on his client's behalf and prepared the client to address the court in asking for as short a sentence as possible. None of that happened here.

Given the near maximum sentence imposed, defense counsel had nothing to lose in pleading on his client's behalf and asking others to do so as well. He did not do so, and the result was a very lengthy sentence for a young man whose conviction was for a crime that appears to have been unplanned and committed in a moment of panic. Within the context of murder convictions, the case did not warrant a near-maximum sentence, particularly given Defendant's age.

## POINT FOUR

### THE PROSECUTOR'S ARGUMENTS RELYING ON MATTERS NOT IN EVIDENCE AND VOUCHING FOR WITNESSES DEPRIVED DEFENDANT OF A FAIR TRIAL.

At trial, the prosecutor referred to matters not in evidence and vouched for witnesses. Over and over again. The prosecutor's improper arguments went far outside the "well defined limits" of what attorneys may argue to the jury (*People v. Ashwall*, 39 NY2d 105, 109 [1976]).

The Non-Witness Accusation

52

In his opening statement, the prosecutor stated that Donte Kennedy told a detective that he had seen Defendant shoot Kelly and Defendant was "the person who committed the murder" (T. 39-40). Kennedy never took the witness stand; neither did the detective. In truth, even if the prosecutor had called the detective to testify about Kennedy's words, the court would have sustained a defense objection to the witness testifying about the accusations of another suspect.

The prosecutor's assertion concerning his "knowledge" of Kennedy's accusation was an egregious violation of the rules of evidence, putting matters before the jury that were not part of the trial, and double hearsay, at that (see *People v. Calabria*, 94 NY2d 519, 693-4 [2000]; *People v. Simms*, 130 AD2d 525, 526 [2d Dept. 1987]). Making matters worse, the Kennedy accusations violated Defendant's Sixth and Fourteenth Amendment rights to confront and cross-examine his accusers (*Crawford v. Washington*, 541 US 36 [2004]; see *People v. Billingsley,* 74 AD2d 645 [2d Dept. 1980]); *People v. Meyers*, 56 AD 2d 853 [2d Dept. 1977]). In *Bruton v. United States*, 391 US 123 [1968] the Supreme Court held that a co-defendant's out-of-court statement accusing a defendant of crimes could not be admitted into evidence at their joint trial. Kennedy's accusations constituted a Bruton-type error, except that he did not testify at their joint trial.

The situation created by the prosecutor in this case, moreover, had no arguable role in the case. At least in *Bruton*, the statement implicating another was

53

a co-defendant's admission, so the statement was admitted against the co-defendant in the joint trial. Not so here. The prosecutor's statement was an error that went to the very heart of the principal issue in the case: the identity of the shooter. Making matters even worse, the prosecutor's communication of the content of Kennedy's statement to a detective was a form of implicit vouching. It gave Kennedy's accusation the seal of approval as the official position of the NYPD and the District Attorney. By communicating the statement, the prosecutor eliminated the pesky business of the jury evaluating Kennedy for themselves.

That was not the only instance of the prosecutor putting matters before the jury that were not within the four corners of the evidence. In the summation (see ante, at ____), the ADA argued that: (1) Burnett had testified that he possessed the Gun because Defendant "allowed" it; (2) that Layne and Burnett had both testified that the Gun was owned by Defendant; and (3) that Layne had told police and grand jurors that Defendant had been the shooter (see *People v. Sandy*, 115 A.D.2d 27, 33 [1ˢᵗ Dept. 1986] [the defendant's indictment evidence of guilt, the grand jury heard this evidence and indicted the defendant]). These arguments were impermissible efforts to invite the jury into "draw[ing] conclusions which are not fairly inferable from the evidence" (*People v. Ashwal*, 39 NY2d at 109-10.).

The Prosecutor's Arguments about his Trial Strategy

54

In his final summation, the prosecutor gave a detailed description of his own thoughts regarding whether he should offer Burnett a four-year sentence for the shoot-out at the Family Picnic. The prosecutor's argument included matters that were not in evidence. Worse than that, it asked the jury to sympathize with his decision-making quandaries and was a form of implicit vouching for the action taken by the District Attorney.

A prosecutor may not "vouch for the witness with the most favorable testimony for the prosecution by reference to his own pretrial conduct and…credibility by virtue of his position in the District Attorney's Office…" (*People v. Moye*, 12 N.Y.3d 743, 744 [2009]. The prosecutor's discussion of his plea negotiation with Burnett, his speculation about Burnett's internal thoughts regarding testifying truthfully, and the prosecutor's theories about the best way to obtain a conviction "exceeded the bounds of proper rhetorical comment during summation" (*People v. Simms*, 130 AD2d 525, 526 [2d Dept. 1987]; *see People v. Calabria*, 94 NY2d 519 523 [2000]). It was argument that should not have been made, and the court should have stopped it before any damage was done. Instead, it overruled the defense objections and gave no curative instruction, in effect approving or legitimizing the prosecutor's improper arguments (see *People v. Ashwal*, supra, at 11).

## The Prosecutor's Advocacy as an Unsworn Witness

On summation, the prosecutor repeatedly referred to the testimony of the two accomplice witnesses as "truthful" and "accurate." This was improper vouching, violating Defendant's right to a fair trial under federal and State law.

In describing the twin evils inherent in this type of advocacy, the Supreme Court has characterized vouching as conveying "...the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the evidence presented to the jury; and the prosecutor's opinion [as to the guilt of the accused] carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *(United States v. Young,* 470 U.S.1 18-19 (1985); *see, also, Berger v. United States,* 295 U.S. 78, 88 [1935] ["improper suggestions, insinuations, and especially assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none"]). This Court has condemned prosecution arguments that the People's witnesses are "accurate," telling "the truth," and saying "exactly how it happened" *(People v. Brown,* 26 AD3d 392, 393 [2nd Dept. 2006]). Those are the very words used by the prosecutor here on summation.

The prosecutor's bolstering was only compounded by his efforts to bring non-evidentiary inflammatory matters before the jury. For example, he paused

56

during a witness' questioning to have him identify two people in the courtroom watching the trial. Then, on summation he argued that "all these folks out in the audience, friends of the defendant" had created pressure on Burnett that caused his recantation to the defense attorney months earlier, and argued that the reason Burnett appeared uncomfortable on the witness stand was because, "When he …testifies against this defendant, it's over. He is completely ostracized".

The cumulative effect of the prosecutor's actions, coupled with the court's failure to effectively address the improprieties, denied Defendant a fair trial (see US Const. Amdt. XIV; NY Const. art I § 6; *People v. Calabria*, 94 NY2d 519, 523 [2000]; see also *People v. Leuthner,* 216 AD2d 327, 328 [2d Dept. 1995]). In a case with less than overwhelming proof of guilt, the convictions should be reversed and a new trial ordered.

## POINT FIVE

### THE PROSECUTION DID NOT SUFFICENTLY AUTHENTICATE THE FACEBOOK MESSAGING EVIDENCE.

At trial, the People introduced conversations and photographs that had been obtained from Facebook's records. The custodian of those records testified that the company could not authenticate who the actual parties were to the conversations or who set up the accounts. The record keeper could only say that certain information or photographs were exchanged between accounts.

57

Authentication is "a condition precedent to admitting evidence" (*United States v. Sliker*, 751 F2d 477, 497 [2d Cir 1984]). The purpose of the rule is to confirm that the evidence is genuine. A photograph must be shown to "accurately represent[ ] the subject matter depicted" (*People v. Byrnes,* 33 N.Y.2d 343, 347 [1974] ). Authentication generally requires a witness to testify that a photograph is accurate and has not been altered (*see People v. Price,* 29 N.Y.3d 472, 477 [2017] ). In other words, there must be a witness, with knowledge, who testifies that the image "accurately represent[s] the subject of the matter depicted" (*People v. Byrnes*, 33 NY2d at 347).

At trial, there were no participants to the private IM conversations or witnesses present to observe the scene when the photographs were taken. No one testified that the images were fair and accurate depiction of the scenes that existed. Indeed, there was no evidence establishing the date photographs were taken. To the extent it included the image of a firearm, there was no evidence that it was the Gun, other than the common weapon's appearance.

Similarly, the only testimony regarding the IM exchanges were individuals who knew Defendant's screen name and the Facebook record-keeper. There was no participant to the conversations who could verify that the Facebook records were accurate renditions of communications between the people the prosecution contended were the participants. (*see People v. Price,* 29 N.Y.3d 472, 476-66

58

[2017]; *People v. Wells*, 161 A.D.3d 1200 [2nd Dept. 2018], lv. den. 32 N.Y.3d 1009 [2018]; *Cf. People v. Franzese*, 154 A.D.3d 701, 706-07 [2nd Dept. 2017], lv. den., 30 N.Y.3d 1105 [2018]; *People v. Shortell*, 155 A.D.3d 1442 [3rd Dept. 2017], lv. den., 31 N.Y.3d 1081 [2018], *People v. Serrano*, 173 A.D.3d 1484, 1487-88 [3rd Dept. 2019], lv. den. 34 N.Y.3d 937, 939 [2019]).

The People failed to satisfy traditional authentication requirements in that the evidence failed to establish that Defendant actually exercised dominion or control over the Facebook messaging at the time it was posted, or a chain of custody (*see, People v. Price*, supra, at 476-77; 478-80). For those reasons, the evidence should have been excluded at trial, and the error provides another ground for reversal.

## POINT SIX

## THE SENTENCE WAS EXESSIVE GIVEN DEFENDANT'S AGE AND THE NATURE OF THE CRIME.

This Court "has broad, plenary power to modify a sentence that is unduly harsh or severe under the circumstances, even though the sentence may be within the permissible statutory range" (*People v. Delgado*, 80 N.Y.2d 780 [1992]; *see* CPL 470.15[6][b]). The power to modify sentences in the interest of justice allows the Court to "rectify sentencing disparities, reach extraordinary situations, and effectively set sentencing policy through the development of sentencing criteria"

(*People v. Suitte,* 90 A.D.2d 80, 86 [2d Dept. 1982]). In so doing, the Court gives consideration to " 'among other things, the crime charged, the particular circumstances of the individual before the court and the purpose of a penal sanction, i.e., societal protection, rehabilitation, and deterrence' " (*People v. Kordish,* 140 A.D.3d 981, 983 [2d Dept. 2016] quoting *People v. Farrar,* 52 N.Y.2d 302, 305 [1981]).

Defendant is not a garden variety recidivist deserving of a sentence reserved for the most hardened criminals. At the time of this crime, Defendant was a teenager (seventeen years old) with no prior criminal convictions. He had recently become more involved with a group of teenagers who spent their time – including school days – at a one of their homes, where they were woefully under-supervised. The group spent their days and nights at the apartment getting high, influenced by an "adult" who was a distinctly negative role model, Donte Kennedy.

Defendant did not set out to kill anyone on the night of Mr. Kelly's shooting. This was not a calculated, premeditated murder, but appears to have been the outcome of an evening that went terribly awry. The Court may also want to consider the roles of others who appear to have suffered no consequences for their roles. Elijah Mack carried the Gun most of the evening and, according to the People's case, he handed Defendant the gun in the midst of the confrontation with Kelly. Donte Kennedy, the group's "role model" was also there, as were Burnett

60

and Layne. At the moment that the Gun was requested, any of those individuals could have stopped the trajectory of events. Instead, they appear to have been in accord with or indeed encouraged what was taking place. In fact, Kennedy was the person who initially brought the Gun with the group that night and arranged for its disposal after Burnett's arrest in this case. Insofar as none of the others appear to have been subjected to any criminal sanctions for their roles in the night's unfortunate events, the near-maximum sentence was disproportionate.

Defense counsel should have taken the appropriate steps so the jury had the option of considering the crime of reckless manslaughter which may more accurately describe the crime committed by someone. Unfortunately, he did not so, nor did he advocate effectively on his client's behalf for a lesser sentence than the near maximum sentence imposed.

The sentence should be reversed.

61

## **CONCLUSION**

FOR ALL OF THE FOREGOING REASONS, THE JUDGMENT

SHOULD BE REVERSED AND THE INDICTMENT DISMISSED.

ALTERNATIVELY, THE CONVICTION SHOULD BE REDUCED AND

A NEW TRIAL ORDERED.  FINALLY, THE JUDGMENT SHOULD BE

MODIFIED BY REDUCING THE SENTENCE.

Dated: New York, New York
       March 19, 2020

Respectfully Submitted,

_____

RICHARD E. MISCHEL
MISCHEL & HORN, P.C.
Attorney for Defendant-Appellant
One Whitehall Street, 10th Floor
New York, New York 10004
(212) 425-5191

Richard E. Mischel, Esq.
Gail Jacobs, Esq., Of Counsel

62

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

-------------------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-

A.D. No.

VICTORIOUS KINGSBERRY,

Defendant-Appellant.

Kings County Indictment No. 3289/14

---------------------------------------------------------------------------X

## STATEMENT PURSUANT TO RULE 5531

1. The indictment number in the court below was 3289/14.

2. The full names of the original parties are the People of the State of New York and Victorious Kingsberry.

3. The action was commenced in the Supreme Court of the State of New York, Kings County.

4. The action was commenced by the filing of an indictment on or about

.

5. The appeal is from a judgment convicting the Defendant-Appellant, after a jury trial, of the crimes of murder in the second degree (Penal Law §125.25), and criminal possession of a weapon in the second degree (Penal Law §265.03).

63

6. The appeal is from a judgment of the Supreme Court of the State of New York, Kings County (Firetog, J.), entered on or about March 7, 2016, convicting the Defendant-Appellant of the crimes of murder in the second degree, and criminal possession of a weapon in the second degree, and sentencing him to an indeterminate term of imprisonment of twenty-three years to life, and a determinate fifteen year term, respectively, to be served concurrently, five years post-release supervision, and mandatory surcharges and fees.

7. The Defendant-Appellant is prosecuting this appeal on the original papers.

64